# In the United States Court of Federal Claims

No. 24-79

(Filed under seal: June 12, 2024)
(Reissued: June 24, 2024)

_____

|  |  |
|---|---|
| **PMCG COLLABORATEUP JV LLC,** | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| **v.** | ) |
| | ) |
| **THE UNITED STATES,** | ) |
| | ) |
| Defendant. | ) |
| | ) |

_____

Daniel J. Strouse, Cordatis LLP, Arlington, VA, for plaintiff.

Natalee A. Allenbaugh, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. for defendant. With her on the briefs were Brian M. Boynton, Principal Deputy Assistant Attorney General, Civil Division, Patricia M. McCarthy, Director, and Corinne A. Niosi, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C. Of counsel were Rachel B. Cochran, Assistant General Counsel (Acting), and Amy McQuade and Eugene J. Benick, Attorney Advisors, Litigation & Enforcement Division, U.S. Agency for International Development, Washington, D.C.

## OPINION AND ORDER[1]

LETTOW, Senior Judge.

Pending before the court in this bid protest are the parties' cross-motions for judgment on the administrative record. Pl.'s Mot. for J. on the Admin. R. ("Pl.'s Mot."), ECF No. 24; Def.'s Cross-Mot. for J. on the Admin. R. & Resp. to Pl's Mot. ("Def.'s Cross-Mot."), ECF No. 27.

_____

[1] Because of the protective order entered in this case, this opinion and order was initially filed under seal. Opinion and Order of June 12, 2024, ECF No. 33. The court requested that the parties review the opinion and order and submit proposed redactions of any confidential or proprietary information. The parties submitted jointly proposed redactions. Redactions are shown by asterisks enclosed by brackets, _e.g._, "[***]."

This protest concerns a request for proposals initially issued by the United States Agency for International Development ("USAID") on March 31, 2023. AR 327.[2]

Plaintiff's status as a joint venture shapes the chief issue in this case, namely whether and how the exclusion of one of its members affects plaintiff's eligibility for an award. Plaintiff PMCG CollaborateUp JV LLC ("PMCG CollaborateUp" or "the joint venture") is a joint venture comprised of Crespin Enterprises Inc. dba CollaborateUp ("CollaborateUp") and PMCG Consulting Group LLC dba Vistant ("Vistant"). Compl. ¶ 3. After informing plaintiff that it was an "apparently successful [o]fferor," the contracting officer learned that USAID had suspended Vistant and the manager representing its interests in the joint venture, Mr. Walter Barnes, III. AR 1958-60. The contracting officer then informed plaintiff that, "[b]ecause of the active exclusion of Vistant, USAID will not be moving forward with th[e] award." AR 1957.

Two related government actions are at issue. First, plaintiff challenges USAID's decision that PMCG CollaborateUp JV LLC was ineligible for the award based on the exclusion of Vistant. Compl. ¶¶ 15-22. Second, plaintiff contests USAID's failure to refer this decision to the Small Business Administration ("SBA") to make a certificate of competency determination before eliminating plaintiff from the competition. Compl. ¶¶ 23-31. The parties' motions are fully briefed. Pl.'s Resp. to Def.'s Cross-Mot. and Reply in Supp. of Pl.'s Mot. ("Pl.'s Resp."), ECF No. 28; Def.'s Reply in Supp. of its Cross-Mot. ("Def.'s Reply"), ECF No. 29. The court held a hearing on April 24, 2024, *see* Mot. Hr'g Tr., ECF No. 32, and the parties' motions are ready for disposition.

## FACTS[3]

On March 31, 2023,[4] USAID issued an initial solicitation for a multiple-award indefinite-delivery, indefinite-quantity ("IDIQ") contract. AR 327, 336.[5] Specifically, USAID

---

[2] The administrative record is consecutively paginated and will be cited as "AR __." At the court's direction, the administrative record was supplemented with three additional pages that will be cited as "SuppAR__." *See* Order of Feb. 22, 2024, ECF No. 20 (denying defendant's motion for reconsideration of the court's decision to supplement the administrative record because the court found the post-decisional information at issue was the predicate for the agency's decision and was therefore necessary for effective judicial review), released publicly on Feb. 28, 2024, ECF No. 23.

[3] The court's findings of fact are based on the administrative record as required by Rule 52.1 of the Rules of the Court of Federal Claims ("RCFC"). *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1357 (Fed. Cir. 2005) (interpreting RCFC 56.1, which was subsequently replaced by RCFC 52.1); RCFC 52.1.

[4] The solicitation was revised twice following questions from potential offerors. *See* AR 547-789 (first revised solicitation); AR 790-988 (second revised solicitation).

[5] IDIQ contracts "provide[] for an indefinite quantity, within stated limits, of products or services during a fixed period." Dominick A. Fiorentino & Alexandra G. Neenan, Cong. Rsch. Serv., IF 12558, *Indefinite Delivery, Indefinite Quantity Contracts* at 1 (2023). IDIQ contracts

sought contractors to provide "USAID Regional and Bilateral Missions within Central and Latin America with a flexible, streamlined, and total integrated service solution for addressing a variety of issues affecting the root causes of irregular migration from Central America to the United States." AR 352. The agency anticipated awarding the contract to four small businesses and to "[u]p to six" other-than-small businesses. AR 810.

### A.   Relevant provisions of the joint venture

Prior to responding to USAID's solicitation, Vistant and CollaborateUp entered a joint venture agreement on December 22, 2022, for the purpose of bidding on contracts and, if successful, performing the solicited work. AR 1168, 1197. That agreement named Richard Crespin as CollaborateUp's manager and Walter Barnes, III as Vistant's manager. *See* AR 1170, 1187. The SBA subsequently approved the corresponding mentor-protégé agreement on February 27, 2023. AR 1197.

CollaborateUp is the managing venturer and Vistant is the participating venturer. *See* AR 1166. Accordingly, CollaborateUp has "the overall responsibility for performance of the [c]ontract" and "control[s] the day-to-day management and administration of the contractual performance," serves as the "primary point of contact with the [c]lient during evaluation of the [j]oint [v]enture's proposal," and makes final decisions for the joint venture. AR 1169-70, 1172. CollaborateUp is also given "primary responsibility" both for "any negotiations with the [c]lient regarding the [j]oint [v]enture's proposal for the [c]ontract," including task or delivery orders issued under the contract, and for "ensuring appropriate labor for the effort." AR 1172.

For its part, Vistant would "assist and support [CollaborateUp] in pre-proposal, proposal, and post-proposal efforts." AR 1169-70. Vistant was also given the ability to provide input regarding CollaborateUp's staffing decisions, corporate governance activities, and the pre-proposal and post-proposal efforts with respect to the areas of work for which CollaborateUp is responsible, as well as on all other "significant decisions." AR 1169-70, 1172-73.

The joint venture agreement adopts regulatory requirements governing the ownership and performance of work by mentor-protégé program joint ventures. Under the agreement, CollaborateUp owns 51% of the joint venture and Vistant owns 49%. AR 1169; *see also* 13 C.F.R. § 124.513(c)(3) ( "[T]he 8(a) [p]articipant(s) must own at least 51% of the joint venture" for the joint venture to be eligible for an 8(a) contract.). Moreover, CollaborateUp "shall always perform at least 40% of the work performed by the [j]oint [v]enture." AR 1173; *see also* 13 C.F.R. § 124.513(d)(2) ("[T]he 8(a) partner(s) to the joint venture must perform at least 40% of the work performed by the joint venture."). CollaborateUp is free to "establish each [p]arty's

---

may be used "when the [g]overnment cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the [g]overnment will require during the contract period" and should be used "only when a recurring need is anticipated." Federal Acquisition Regulations ("FAR") § 16.504(b). Once multiple-award IDIQ contracts are awarded, all contract holders are given a "fair opportunity" to compete for orders issued under the contract. FAR § 16.505(b)(1).

percentage of work for each [c]ontract, project, and/or any orders under the [c]ontract" in compliance with relevant regulations.  *See* AR 1173.

The joint venture agreement contemplated that the parties would issue addenda for each solicitation they pursued.  AR 1166.  On May 1, 2023, the parties executed an addendum covering the USAID solicitation.  AR 1197.  The addendum provided an allocation of duties tailored to the specific solicitation.  At the time, because the contract's "particular level of effort and specific performance methods [we]re not currently known," the joint venture indicated that, "[o]nce a definitive scope of work" is available, the venturers would "jointly review the scope of work" and supplement the addendum with a specific allocation of duties.  AR 1199.  Under the staffing plan submitted with the addendum, CollaborateUp would provide "[n]ot less than 40%" of the work required by "all task orders awarded over the life of the contract," and Vistant would provide "[n]ot greater than 60%."  AR 1200.  In its proposal, the joint venture reiterated that "60 and 40 percent represent an estimated breakdown of the work for the overall IDIQ" contract and that profit and work allocation will accordingly be determined on a task order by task order basis.  AR 1206.

The joint venture agreement contemplates the possibility that one of its members might be suspended.  Under section 31, the default provision, a party defaults if it "is suspended, debarred or otherwise unable or ineligible to perform its obligations" under the joint venture agreement.  AR 1175-76.  Following default, the non-defaulting party "shall give the [d]efaulting [p]arty written notice of default with an opportunity to cure" within 30 days.  AR 1176.  If the defaulting party fails to cure within that period, the non-defaulting party may unilaterally suspend or exclude the defaulting party "from further participation in the JV," and may "wind up the affairs of the JV so far as concerns the [d]efaulting [p]arty," and may "complete the performance of the [c]ontract either in its own name or in the name of the JV."  AR 1176.

Additionally, under section six of the agreement, the venture will "continue in full force and effect until . . . any [m]ember is suspended or debarred by any state or federal contracting agency."  AR 1168.  Section six also provides that "[n]otwithstanding the foregoing, the [j]oint [v]enture shall not terminate prior to the duration of the complete [c]ontract period of performance, including all awards thereunder, unless the [c]lient grants its prior written approval."  AR 1169.

Moreover, upon the end of the term "as provided in Section 6," the joint venture will be dissolved, "liquidated promptly," and the parties will "promptly rescind" pending "offers and proposals" submitted by the joint venture.  AR 1176-77.

The joint venture agreement formed "an exclusive relationship . . . meaning no [p]arty may independently submit a proposal, or contract with any third party to submit a proposal, for any part of the work" for any projects the parties "have agreed to jointly pursue through this [a]greement."  AR 1169.

### B. *The joint venture's proposal and its subsequent elimination from consideration*

On May 31, 2023, PMCG CollaborateUp JV responded to USAID's request for proposals as a joint venture formed under the mentor-protégé program.  AR 1006, 1197.  The offerors were

evaluated based on technical factors and cost/price factors, and source selection was conducted using a tradeoff evaluation. *See* AR 966; FAR § 15.101-1. Accordingly, if either the technical proposals or the cost/price proposals were deemed "essentially equal," the other factor "may become the determining factor in source selection." AR 966. Moreover, "[t]he [g]overnment intend[ed] to award a [c]ontract *without* discussions with [o]fferors in accordance with FAR 52.215-1. However, discussions may be conducted at the [c]ontracting [o]fficer's discretion." AR 963.

The solicitation identified three technical evaluation criteria, from most to least important: (1) corporate experience and capability, (2) maximizing use of local entities, and (3) contractor past performance information. AR 963-64. The solicitation required the offeror to include "up to 10 corporate experience submissions." AR 951. Of the ten corporate experience contracts PMCG CollaborateUp JV LLC submitted, [***] performed by Vistant, [***] by an entity named [***], [***] by [***], and [***] by CollaborateUp. AR 1007-27.

On November 8, 2023, the agency conducted the pre-award responsibility determination. AR 1951. On November 9, 2023, USAID sent plaintiff an email indicating that it was "an apparently successful [o]fferor" and asking plaintiff to sign and return the contract attached thereto. AR 1820. That same day, USAID published a notice announcing Vistant's suspension and indicating the exclusion had become active two days prior, on November 7. AR 1924-25, 1951. Plaintiff returned the signed contract on November 10. AR 1820.[6]

On November 13, 2023, USAID notified PMCG CollaborateUp JV that "USAID will not be moving forward with this award" because it had discovered the active exclusion against Vistant. AR 1957. According to Vistant's contemporaneous SAM.gov page,[7] Vistant was deemed to be

> [p]reliminar[ily] ineligible based upon adequate evidence of conduct indicating a lack of business honesty or integrity, or a lack of business integrity, or regulation, statute, executive order or other legal authority, pending completion of an investigation and/or legal proceedings; or based upon initiation of proceedings to determine final ineligibility based upon regulation, statute, executive order or other legal authority or a lack of business integrity or a preponderance of the evidence of any other cause of a serious and compelling nature that it affects present responsibility.

AR 1938.

---

[6] "The contracting officer normally signs the contract after it has been signed by the contractor." FAR § 4.101. Only once it is signed by both parties is it binding.

[7] The System for Award Management ("SAM") database "[e]stablish[es] a common source of vendor data," FAR § 4.1100(b), that the government uses to "mak[e] responsibility or qualification determinations for vendors," as well as other assessments, during the federal award lifecycle. Gen. Servs. Admin., *Data Bank*, SAM.gov, https://sam.gov/reports/ei/static (last visited June 12, 2024).

The contracting officer explained that he decided not to award the joint venture the contract based on Vistant's exclusion, joint venture agreement sections 6, 9, and 31, and section 5.2 of the second addendum to the joint venture agreement. AR 1943-52. Specifically, he reasoned that Vistant's suspension was grounds for default of the joint venture agreement and that Vistant "was the driving force" both "in terms of experience and programmatic work" because it owned 49% of the venture, was contemplated to perform the majority of the labor under task orders, and provided [***] of the corporate capability statements. AR 1951-52.[8] He further explained that "the removal of [Vistant] due to the exclusion[] makes the JV legally questionable," and without Vistant "the sole eligible member of the JV was only responsible for [one] corporate experience description" with the remainder coming from "major sub[]contractors not part of the JV." AR 1951. Put differently, "there is no JV without PMCG (dba Vistant)." AR 1951. For these reasons the contracting officer concluded Vistant's exclusion "makes the entire JV not viable in terms of award." AR 1951. Further, the contracting officer found that "[b]ecause the JV is so intertwined with [Vistant]" and Vistant had an exclusion against it, he could not "make an affirmative determination of responsibility for the joint venture." AR 1951-52. Aside from acknowledging that Mr. Barnes was also suspended and signed the joint venture agreement on behalf of Vistant, the contracting officer did not specifically discuss whether Mr. Barnes's suspension impacted his decision not to award the contract. AR 1943-52.

In response, Mr. Crespin of CollaborateUp sought to retain the contract. First, he proposed that PMCG CollaborateUp JV LLC "abstain[] from responding to any task order solicitations until Vistant LLC's situation is fully resolved" and that, in the interim, the joint venture be allowed to retain its award status. AR 1956. The contracting officer responded, clarifying that the award never became binding because it was not signed by the contracting officer and indicating it was impossible to make the award to the joint venture. AR 1955-56.

Mr. Crespin then suggested replacing Vistant with [***] as the participating venturer. AR 1954-55. He represented that [***] "can provide all the same qualifications, management, compliance, and technical capabilities previously provided by Vistant" and that "[e]verything else in [the joint venture's] offer would remain the same." AR 1955. The contracting officer responded that "it is not possible for a new entity to apply" for the solicitation "as the closing date for submissions has passed." AR 1954. As of April 24, 2024, USAID has not awarded any task orders to small businesses under the contract. Mot. Hr'g Tr. 5:25 to 6:18.

During an initial status conference, plaintiff's counsel informed the court that an application to lift the exclusion had been made. *See* Initial Status Conference Hr'g Tr. 9:25 to 10:18 (Jan. 23, 2024), ECF No. 13. And, as of January 30, 2024, USAID lifted Vistant's suspension. Pl.'s Mot. at 2; Mot. Hr'g Tr. 15:1-25. As a result, the SAM.gov entry for Vistant now indicates there are no active exclusions against it. Supp. AR 1-3. At the time of this writing, Mr. Barnes still has an active exclusion against him. SAM.gov, *Walter Barnes*,

---

[8] The record indicates Vistant provided [***] of the corporate capability statements, not [***] as the contracting officer concludes. *Compare* AR 1009, 1011, 1013, 1014 ([***] corporate capability statements from Vistant), *with* AR 1951 (attributing [***] projects to Vistant).

https://sam.gov/exclusions-new?pirKey=523871&pirValue=1699444106841864 (last visited June 12, 2024).

## STANDARDS FOR DECISION

"A bid protest has two steps." *DynCorp Int'l, LLC v. United States*, 10 F.4th 1300, 1308 (Fed. Cir. 2021). First, this court applies the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706, to determine whether the government committed an error during the procurement. *Id.*; 28 U.S.C. § 1491(b)(4). Under Section 706 the court shall "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). The court may set aside an award decision "if (1) 'the procurement official's decision lacked a rational basis' or (2) 'the procurement procedure involved a violation of regulation or procedure.'" *DynCorp Int'l, LLC*, 10 F.4th at 1308 (quoting *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1377 (Fed. Cir. 2020)).

Second, the court determines whether the bid protest plaintiff has established it was prejudiced by the errors in the procurement process. *DynCorp Int'l, LLC*, 10 F.4th at 1308. Put differently, plaintiff must "show that there was a 'substantial chance' it would have received the contract award but for the errors." *Bannum, Inc.*, 404 F.3d at 1353 (quoting *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

A court conducting review under the APA is typically constrained to only the evidence that was "before the decision maker at the time of the final award." *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000). This record may be supplemented with post-decision evidence in limited circumstances. *See Murakami v. United States*, 46 Fed. Cl. 731, 735 (2000). For instance, if a contracting officer relied upon a preliminary debarment decision in deciding not to award a contract to the plaintiff, a final decision terminating a proposed debarment may be considered even if it post-dates the award decision. *Afghan Am. Army Servs. Corp. v. United States ("AAA")*, 106 Fed. Cl. 714, 723-26, *as supplemented*, 106 Fed. Cl. 751 (2012). This court may also consider such extra-record evidence in resolving "matters that were not before the agency but that are nonetheless properly before the court—matters such as prospective relief and prejudice." *N.C. Bus. Enters. Program v. United States*, 110 Fed. Cl. 354, 361-62 (2013).

The Tucker Act empowers the court to award injunctive relief to successful protestors. 28 U.S.C. § 1491(b)(2). In deciding whether to grant injunctive relief, the court "consider[s] whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief." *Dell Fed. Sys., L.P. v. United States*, 906 F.3d 982, 990-91 (Fed. Cir. 2018) (quoting *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)). No one of these factors is dispositive. *Glob. K9 Prot. Grp., LLC v. United States*, 169 Fed. Cl. 116, 152 (2023).

In issuing an injunction, the court must avoid "undue judicial interference with the lawful discretion given to agencies." *See Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1384 (Fed. Cir. 2009). In the context of a bid protest, "[i]njunctive relief is appropriate if it 'enjoin[s]

the illegal action and return[s] the contract award process to the status quo ante.'" *Turner Constr. Co. v. United States*, 645 F.3d 1377, 1388 (Fed. Cir. 2011) (quoting *Parcel 49C Ltd. P'ship v. United States*, 31 F.3d 1147, 1153 (Fed. Cir. 1994)).

This court may also "remand a matter to an agency for further consideration." *IAP Worldwide Servs., Inc. v. United States*, 160 Fed. Cl. 57, 65-66 (2022) (explaining that the court's power to remand is expressly provided in 28 U.S.C. § 1491(a)(2)); *see also* 28 U.S.C. § 1491(a)(2) ("In any case within its jurisdiction, the court shall have the power to remand appropriate matters to any administrative or executive body or official with such direction as it may deem proper and just."); RCFC 52.2.  Such a remedy is proper if "the record before the agency does not support the agency action, if the agency has not considered all relevant factors, or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it."  *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *see also IAP Worldwide Servs., Inc.*, 160 Fed. Cl. at 82-83.

## ANALYSIS

Plaintiff's motion for judgment on the administrative record challenges the contracting officer's determination that the joint venture was "not viable in terms of award," AR 1951, and his decision to eliminate the joint venture from the competition without first referring the matter to the SBA for a certificate of competency determination.  Pl.'s Mot. at 8-18.

### A.  The contracting officer's finding that the joint venture was not viable

The parties dispute whether the contracting officer's conclusion that the joint venture was non-viable based on Vistant's exclusion was arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.  Specifically, the parties disagree on whether the contracting officer's nonviability determination (1) constituted a valid exercise of his authority, (2) erroneously rested on a suspension that was removed three months after the award decision, and (3) was rationally based on the joint venture agreement.

### 1.  Whether the contracting officer acted within his authority

At issue is the contracting officer's authority to conduct technical evaluations and to give effect to suspensions.  The parties' arguments turn in part on whether the contracting officer's nonviability determination constitutes a nonresponsibility determination or a technical unacceptability determination.  The FAR mandates that "[n]o purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility.  In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of non-responsibility."  FAR § 9.103(b).  Under the solicitation the contracting officer will make an award to "responsible [o]fferor(s) whose proposal(s) represents the best value" to the government "after evaluation in accordance with all factors and sub-factors in this solicitation," namely the technical factors and cost/price factors.  AR 966, 1000-03 (outlining the technical evaluation ratings methodology).

Contracting officers can be "designated as the source selection authority."  FAR § 15.303(a); *see* AR 993 (identifying the contracting officer as the source selection authority).  In this role they must "consider[] only cost or price and the other factors," in this case technical

factors, "included in the solicitation" when awarding a contract. 10 U.S.C. § 3303(c). The solicitation at issue charged the contracting officer with using the "overall evaluation methodology" set forth in the solicitation "as a guide in determining which proposal(s) offer the best value to the U.S. [g]overnment." AR 966. To support the contracting officer's review of the technical aspects of proposals, the solicitation established a Technical Evaluation Committee ("TEC") to "conduct a comprehensive evaluation of each submission . . . in accordance with the [source selection plan] and the evaluation factors contained in the solicitation." AR 993-96. The contracting officer was required only to consider the TEC's recommendations. FAR § 15.303(b)(5). Contracting officers are precluded from "award[ing] contracts" to suspended or debarred contractors "unless the agency head determines that there is a compelling reason for such action," which is not alleged here. FAR § 9.405(a). Contractors that are debarred or suspended "are excluded from receiving contracts" and from "conducting business with the [g]overnment as agents or representatives of other contractors." *Id.*

Plaintiff alleges the contracting officer exceeded his authority by "effectively stepp[ing] into the shoes of a suspension official" and by "sp[eaking] on behalf of a technical evaluation committee." Pl.'s Mot. at 9-11, 15-16. According to the joint venture, the contracting officer acted as a suspending official by imputing Vistant's suspension to the joint venture. *Id.* at 10. The contracting officer did so even though neither the joint venture nor CollaborateUp was suspended and notwithstanding the suspending official's decision not to suspend the joint venture along with Vistant. *Id.* at 10-11.

Relatedly, the joint venture avers that the contracting officer exceeded his authority by failing to conduct a new technical acceptability assessment before concluding that removing Vistant from the joint venture "would substantially change the technical review by the TEC." *Id.* at 15-16 (quoting AR 1951). But the record does not indicate the contracting officer consulted the technical evaluation committee. *Id.* at 16. Nor does the record contain a new evaluation accounting for Vistant's suspension. *Id.* Indeed, the contracting officer assessed neither the corporate experience examples provided by CollaborateUp nor those of proposed subcontractors. Pl.'s Resp. at 4-5. Instead, the contracting officer only catalogued which of the ten corporate responsibility statements were attributable to CollaborateUp and "said that the evaluation would be different" considering Vistant's suspension "but didn't say what it was." Mot. Hr'g Tr.7:16 to 8:24, 38:18 to 40:5. And removing Vistant's experience references should not automatically warrant a finding of unacceptability because offerors could, but were not required to, provide up to 10 references. Pl.'s Resp. at 5.

Defendant argues that the contracting officer acted within his authority when he concluded that Vistant's "exclusion makes the entire JV not viable in terms of award." AR 1951; *see* Def.'s Cross Mot. at 22-23. Defendant argues that the contracting officer did not impute Vistant's suspension to the joint venture but rather "concluded that the suspension of Vistant materially affected the validity of the JV's proposal." Def.'s Cross-Mot. at 22.

Defendant further argues the contracting officer's conclusion does not usurp the technical evaluation committee's authority because, under the FAR, "[t]here is no requirement to send the proposal back for a new TEC evaluation" and a contracting officer "is required to exercise independent judgment about the viability of the proposal." Def.'s Cross-Mot. at 23. The solicitation's provisions comport with the FAR insofar as they "allow for input from the TEC but

properly describe the [contracting officer's] retention of ultimate decision-making authority." Def.'s Reply at 5. Moreover, no provision in the solicitation "require[s] the [contracting officer] to send the proposal back to the TEC for re-evaluation." *Id.* According to the government, the contracting officer properly exercised his authority in considering the impact of these exclusions on the joint venture's technical capabilities. Def.'s Cross-Mot. at 16-17. The joint venture had lost a manager because Mr. Barnes had been suspended. *Id.*[9] Moreover, Vistant was responsible for four of the ten corporate experiences presented in the joint venture's offer. *Id.* Considering that "the technical factors as a whole were 'significantly more important than cost/price factors,'" the contracting officer "rationally determined that losing the JV member responsible for 'the bulk of the experience presented in the JV's offer' was a critical, material loss." *Id.* at 17-18 (first quoting AR 963, then quoting AR 1951).

The contracting officer's decision not to award the joint venture the contract rests on two related conclusions: (1) "[b]ecause the JV is so intertwined with [Vistant]" and Vistant had been excluded, the contracting officer "[could not] make an affirmative determination of responsibility for the JV;" and (2) Vistant's exclusion "makes the entire JV not viable in terms of award" because Vistant "was the driving force in the JV in terms of experience and programmatic work." AR 1951-52. That the first conclusion constitutes a responsibility determination is more straightforward. The FAR contemplates only two types of responsibility determinations: an "affirmative determination of responsibility" and a nonresponsibility determination that is assigned absent clear evidence that the contractor is responsible. FAR § 9.103(b). Accordingly, in finding he could not make an affirmative determination of responsibility because of the joint venture's relationship with Vistant, the contracting officer determined the joint venture was nonresponsible.

The second conclusion also necessarily relies on a responsibility determination. While removing Vistant's contributions to the joint venture from the proposal may support a finding that the proposal was technically unacceptable, the relevant fact is that Vistant's exclusion was the only grounds for removing its contributions. Put differently, the contracting officer's determination that the joint venture was not viable is predicated on Vistant's exclusion from the competition, and that exclusion is predicated on the suspending official's preliminary exclusion of Vistant.

The contracting officer did not make a finding of technical unacceptability. His brief discussion of the impact that Vistant's removal would have on the technical review does not support a finding that his opinion expresses a technical unacceptability finding instead. His decision does not apply the technical evaluation factors identified in the solicitation or technical evaluation memorandum. *Compare* AR 1355-61 (TEC evaluation methodology and criteria), *and* AR 1489-97 (TEC evaluation of plaintiff's proposal), *with* AR 1951 (contracting officer's memorandum of decision to exclude plaintiff). And only two of his statements are relevant to plaintiff's technical capabilities. First, he states that "programmatically, [Vistant] w[as] the bulk of the experience presented in the JV's offer." AR 1951. Second, he reasons that Vistant's removal "would substantially change the technical review by the TEC as the sole eligible

---

[9] As discussed *infra* at 19-21 the record is unclear regarding the impact Mr. Barnes' suspension has on USAID's award decision.

member of the JV was only responsible [***] corporate experience description of the 10 provided." AR 1951. While these statements provide good reasons to think the TEC could have reasonably change their assessment, they do not demonstrate that the contracting officer conducted a new technical evaluation and concluded plaintiff's corporate experience would be marginal or unsatisfactory. More importantly, his reasoning is predicated on a nonresponsibility finding. Indeed, he provides the same reasons to support both his conclusion that plaintiff was nonresponsible and that plaintiff was not viable in terms of award. AR 1951-52 (resting both conclusions on Vistant's 49% ownership of the joint venture, the amount of work the joint venture agreement contemplated Vistant would perform, and the fact that Vistant provided "the bulk of the experience presented" in the technical proposal). This underscores the central role Vistant's suspension plays in his ultimate decision not to award plaintiff the contract.

Accordingly, the contracting officer's decision is properly understood as a responsibility determination not a technical acceptability determination. Under the proper circumstances the contracting officer can make a nonresponsibility determination based on a suspending officer's nonresponsibility determination without violating the APA. The court next addresses whether the contracting officer exceeded his authority or otherwise violated the APA by relying on Vistant's preliminary suspension in eliminating the joint venture from the competition. This turns in part on whether the court may consider post-decision factual developments.

### 2. *The contracting officer's reliance on Vistant's suspension and the effect of post-decision developments*

The parties contest whether and how two post-decision developments bear on whether the contracting officer's decision was erroneous. The first development is correspondence between the joint venture and the contracting officer immediately following his decision not to award the contract. The second is the removal of the preliminary exclusion against Vistant.

The relevant post-decision correspondence concerned plaintiff's requests to delay the award decision pending Vistant's efforts to remove the suspension and, in the alternative, to replace Vistant with another entity. The FAR provides two relevant paths for a proposal to be revised after the solicitation closes. First, a solicitation may provide the opportunity for "discussions," defined in the FAR as "negotiations that occur after establishment of the competitive range that may, at the [c]ontracting [o]fficer's discretion, result in the offeror being allowed to revise its proposal." FAR 52.215-1(a). Second, "offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors." FAR § 15.306(a)(2). "Clarifications are limited exchanges, between the [g]overnment and offerors, that may occur when award without discussions is contemplated." FAR § 15.306(a)(1). Whether an exchange between the government and an offeror is a discussion or a mere clarification turns on whether the proposal "has been substantively revised or modified." *ENGlobal Gov't Servs., Inc. v. United States*, 159 Fed. Cl. 744, 766 (2022).

Next, this court has held it may consider the fact that an exclusion was removed after an award decision when assessing the propriety of the award decision. In *Afghan American Army Services Corp.*, the plaintiff, "AAA," submitted its proposal and was deemed nonresponsible by

the contracting officer because AAA had been "refer[red] for proposed debarment" by a suspension and debarment official.  106 Fed. Cl. at 717-22.  In late July 2011, the contracting officer notified AAA of forgery allegations providing the basis for the suspending officer's decision.  *Id.* at 717.  AAA denied the allegations and indicated that it first learned of the charges from correspondence with the contracting officer leading up to the officer's nonresponsibility determination.  *Id.* at 721.  Nevertheless, in August 2011, the officer found AAA nonresponsible without giving it an opportunity to investigate the allegations of nonresponsibility.  *Id.* at 718, 721.  AAA's proposed debarment was terminated in February 2012, during its protest before this court.  *Id.* at 724.

During its protest, AAA sought leave "to supplement the AR with several documents relating to the termination of its proposed debarment."  *AAA*, 106 Fed. Cl. at 723.  The court concluded that those documents were "necessary for effective judicial review" "[b]ecause the contracting officer relied on the referral for proposed debarment in finding AAA nonresponsible."  *Id.* at 724.  In granting in part plaintiff's motion for judgment on the administrative record, the court determined that "[t]his rush to judgment without obtaining a more complete picture of what transpired was arbitrary and capricious."  *Id.* at 726.  The court explained that the decision terminating the proposed debarment was important to consider because it reflects the government's own determination that the referral for debarment was unsupported.  *Id.*

> In the context of a bid protest, it is particularly appropriate that judicial review be informed by an ancillary *final* debarment decision where the contracting officer only had the benefit of a preliminary decision.  Here, at the time the nonresponsibility determination for AAA was performed, the contracting officer only had the notice of proposed debarment, which represented the initiation of the debarment proceeding, not the final resolution, as the debarment process was still running its course. . . .

> Although the contracting officer cannot be faulted for not considering what she could not have known—that the Army's Suspension and Debarment Official would conclude that the proposed debarment and allegations of forgery were unsupported—that does not mean that this Court should ignore this significant development in adjudicating this bid protest at this point in time. The fact that the contracting officer did not know the notice of proposed debarment would be withdrawn or that the forgery allegations were unsupported does not mean that this Court must put blinders on and ignore these facts now.

*Id.* at 725.  Accordingly, the court declared the nonresponsibility determination null and void and remanded the matter to the agency to reevaluate plaintiff's responsibility without considering the notice of proposed debarment or the allegations supporting it.  *Id.* at 734.

Here, the joint venture argues post-decision communications "should have no bearing on this case" because "materials sent after the agency makes its decision were necessarily not considered by the agency when making the decision."  Pl.'s Resp. at 9.  If post-decision developments are considered, plaintiff contends the communications demonstrate that the joint venture members agreed to continue with the joint venture.  Pl.'s Mot. at 12.  Put differently, the

joint venture did not terminate when Vistant was suspended, and the contracting officer erred by concluding otherwise. And the revocation of Vistant's suspension further supports plaintiff's contention that the contracting officer erred by relying on the suspension as a basis for not awarding plaintiff the contract. *See* Pl.'s Resp. at 10. This also supports plaintiff's argument that it was prejudiced by the government's decision not to award plaintiff the contract without providing it "an opportunity to explain to USAID or SBA why its entity remained viable, despite the suspension of Vistant." *Id*.

The government argues that this court's review is constrained to only the evidence that was before the contracting officer at the time he decided not to award the joint venture the contract. Mot. Hr'g Tr. 21:1 to 23:2, 41:12 to 42:14; Def.'s Reply at 6. Accordingly, defendant contends the court cannot consider the fact that Vistant's suspension was lifted. In the alternative, if post-decision evidence can be considered, defendant argues that the joint venture's communications seeking to substitute another entity for Vistant or "stand down until Vistant's suspension was lifted" demonstrate plaintiff knew that its proposal was rendered nonviable by Vistant's exclusion. Def.'s Cross-Mot. at 18-19. According to the government, revising the proposal to substitute another party for Vistant would constitute a discussion, and the contracting officer cannot hold discussions with just one offeror. Def.'s Reply at 3-4.

First, in response to the joint venture's post-decision emails, the contracting officer permissibly refused to open discussions regarding plaintiff's proposal. The solicitation at issue stated "[t]he [g]overnment does not contemplate holding discussions, however, it reserves the right to hold discussions if necessary." AR 998; AR 963. Additionally, substituting [***] for Vistant would have amounted to a substantive revision to the proposal, not a mere clarification. Nevertheless, these communications may be considered to assess whether the contracting officer erred by deciding not to award the joint venture the contract without obtaining more evidence regarding the suspension and Vistant's efforts to remove it.

Second, the removal of Vistant's suspension can be considered by this court and provides evidence that the contracting officer predicated his decision on a fact that has been overtaken by subsequent events. This case is relevantly similar to *AAA*. At the time he made the decision, the contracting officer had only the email informing him that Vistant had an active exclusion against it, the SAM database entries noting these exclusions, and the agency notice indicating the administrative record established that Mr. Barnes and Vistant, among others, "were involved in a procurement misconduct scheme." AR 1943-45. Moreover, the record suggests plaintiff first learned of Vistant and Mr. Barnes's suspension at the same time that it learned USAID would not move forward with its award. *See* AR 1956-57. Upon learning that the contracting officer decided not to award plaintiff the contract because of Vistant's suspension, the joint venture requested an opportunity to investigate and challenge that suspension. AR 1956. And the contracting officer refused to stay or reconsider its decision even after the joint venture indicated Vistant was working with the government to lift the suspension against it. AR 1953-56. Finally, Vistant's suspension was lifted before any task orders were awarded to small businesses under the contract. SuppAR 1-3; Mot. Hr'g Tr. 5:25 to 6:18.

The minor differences between the circumstances of *AAA* and this case are immaterial for the purpose of resolving these cross-motions. The notice of proposal to debar at issue in *AAA* is relevantly similar to the suspension at issue here. *Compare* FAR § 9.406-3(c) (requiring

proposed debarment notice to identify the reason and cause supporting the proposed debarment and affording the contractor an opportunity to oppose the proposed debarment) *with* FAR § 9.407-3(c) (requiring the notice of suspension to identify the basis and cause supporting the suspension and to explain the temporary nature of suspensions as well as affording the contractor an opportunity to oppose the suspension).  While the record of the proposed debarment proceedings was better developed in *AAA*, the record here establishes that the suspension upon which the contracting officer based his decision not to award plaintiff the contract was lifted before any orders under the contract were issued to small businesses.  In explaining this decision, the contracting officer did not indicate that the award decision with respect to the joint venture had to be made expeditiously.  *See* AR 1953-58.

Although the contracting officer cannot be faulted for not considering this development that occurred after his decision, the court will not turn a blind eye to the current circumstances.  For these reasons, it was arbitrary and capricious for the contracting officer to decide not to award the joint venture the contract before ascertaining more information about Vistant's suspension and efforts to remove it.

### 3.   *The contracting officer's consideration of the joint venture agreement*

Next, the joint venture contends the contracting officer's conclusion "that the joint venture was 'legally questionable' and that 'there is no JV'" rests on a misreading of the joint venture agreement.  Pl.'s Mot. at 11 (quoting AR 1951).  Specifically, the contracting officer failed to address provisions governing the term and termination of the joint venture that plaintiff insists allow the joint venture to continue after a member is suspended.  For instance, section seven empowers the joint venture members to agree to extend the joint venture's term.  *Id.* at 11-12; AR 1169.  Additionally, while section 31 defines a defaulting party to include a member that is suspended, it requires the defaulting party be given an opportunity to cure a default arising from suspension.  Pl.'s Mot. at 12-13.  If the defaulting party fails to cure, the non-defaulting party can elect to "*carry on and complete the performance of the [c]ontract either in its own name or in the name of the JV*."  *Id.* at 13 (quoting AR 1176).  Moreover, if one member withdrew from the venture, the other member was "*individually obligated* to ensure performance of the IDIQ [c]ontract and each [o]rder awarded to the [j]oint [v]enture" under paragraph 11.0 of addendum two to the agreement.  *Id.* at 13-14 (quoting AR 1203).

Plaintiff asserts that the contracting officer also misstated the joint venturers' division of labor.  Based on joint venture provisions capping Vistant's work under any task order to 60% and requiring CollaborateUp to perform at least 40% of the work, he determined that "Vistant 'was contemplated to perform the majority of the labor of any resulting task order.'"  Pl.'s Mot. at 15 (quoting AR 1951).  But plaintiff contends that these provisions instead "contemplate[] the *maximum* amount of work Vistant could perform" and do not "determine[] the amount of work each party would perform for particular task orders."  *Id.*

Plaintiff argues that the court should not consider post-decision communications in determining the meaning of the joint venture agreement's terms.  Pl.'s Resp. at 9.  Alternatively, plaintiff argues that if the communications are considered, they demonstrate only plaintiff's "attempt to find a resolution to a problem" and "are not indicative of whether the joint venture remained viable."  *Id.* at 9.

Defendant contends that the joint venture agreement provides a rational basis for the contracting officer's nonviability determination. The term and termination provisions support this conclusion because the term, default, and dissolution sections of the joint venture agreement all name, directly or by cross-reference, suspension as an operative event concluding the joint venture and initiating the wind-up process. Def.'s Cross-Mot. at 19-21. On this reading, section 31's cure provisions are at best "inconsistent with the majority of the JV Agreement" and insufficient to show the contracting officer's non-viability determination was erroneous. *Id.* at 20. Additionally, the division of labor provisions support his conclusion because they establish that Vistant owned 49% of the joint venture and "was expected to do most (60%) of the work." *Id.* at 16. Moreover, Vistant was expected to perform [***]. *Id.* The contracting officer read these terms and "correctly noted that '[p]er the terms of the JV agreement between the parties, suspension of a party are *grounds* for Default of the JV agreement.'" Def.'s Reply at 6-7 (quoting and adding emphasis to AR 1951). This finding supported his conclusion that "the JV [is] legally *questionable* per the terms of the JV." *Id.* (quoting and adding emphasis to AR 1951).

The government next contends that post-decision communications between CollaborateUp and the contracting officer support the officer's reading of the joint venture agreement—namely that the termination provision is self-executing. Def.'s Cross-Mot. at 21. For instance, CollaborateUp's offer to replace Vistant with [***] could only comport with the joint venture's exclusivity clause if Vistant's suspension terminated the agreement. *Id.* The correspondence also suggests that "the JV understood the implications of Vistant's suspension," specifically that "the proposal as originally submitted was not viable." *Id.* at 18-19. According to defendant, the contracting officer correctly considered CollaborateUp's proposed resolutions to be impermissible efforts to "rewrite . . . its proposal after th[e] deadline" had passed. *Id.* at 18; *see also* Def.'s Reply at 3 ("[T]he solicitation contemplated that the agency would make an award without holding discussions . . . [and] because the [contracting officer] did not hold discussions, there was no basis to allow for a revised proposal, and any discussions with the JV . . . would be prohibited.").

The joint venture agreement's provisions do not support a conclusion that the joint venture terminated automatically upon Vistant's suspension. Read together, the agreement's term and termination provisions instead establish that suspension results in the joint venture's termination only if the suspension goes uncured. While, for the purposes of the award at issue the contracting officer correctly concluded "there is no JV" without Vistant, he erred in determining that the JV was nonviable or "legally questionable" based on the suspension against Vistant.

This court "interprets the 'provisions of a contract so as to make them consistent' and so as not 'to render them ineffective or superfluous.'" *Hendrickson v. United States*, 131 Fed. Cl. 489, 497-98 (2017), *aff'd*, 714 F. App'x 1018 (Fed. Cir. 2018) (quoting *Abraham v. Rockwell Int'l. Corp.*, 326 F.3d 1242, 1251, 1254 (Fed. Cir. 2003)). As relevant here, the terms of the joint venture agreement do not support a determination that the joint venture had effectively dissolved. While section six provides that the joint venture will "continue in full force and effect until . . . any [m]ember is suspended or debarred by any state or federal contracting agency," AR 1168, other parts of the agreement explain that termination is contingent upon further actions. For instance, if the suspension occurs after a contract has been awarded, "the [j]oint [v]enture

shall not terminate prior to the duration of the complete [c]ontract period of performance . . . unless the [c]lient grants its prior written approval."  AR 1169.

More relevant to these circumstances is the default provision, section 31.  The default provision overlaps with section six and provides more specific procedures.  If there is tension between section six's general provisions and section 31's specific provisions, section 31's specific provisions will govern.  *See, e.g.*, *Dravo Corp. v. United States*, 480 F.2d 1331, 1333 (Ct. Cl. 1973); *see also* Restatement (Second) of Contracts § 203(c) ("[S]pecific terms and exact terms are given greater weight than general language.").  Under section 31, a suspended party is a defaulting party and is entitled to "an opportunity to cure" within 30 days of the non-defaulting party providing it notice of default.  AR 1175-76.   Accordingly, section 31(d) of the joint venture agreement provides procedures that must be followed to determine whether the term of the venture expires after a member is suspended.  Put differently, when a party is suspended, one cannot determine whether the suspension terminates the joint venture without first looking to section 31's default provisions.  This reading is further supported by the fact that the joint venture did not rescind its offer, an event the joint venture agreement requires must be done promptly after dissolution and liquidation of the joint venture.  AR 1176-77.  Consistent with this interpretation, the agreement's dissolution provisions are triggered only once the defaulting, suspended party causes the term to expire by failing to cure the default.  *See* AR 1176-77.

The contracting officer's decision not to hold discussions, paired with his finding that Vistant "was the driving force in the JV in terms of experience and programmatic work," AR 1951, entailed that his decision had to be based on the joint venture's proposal without substituting another entity.  The contracting officer was authorized not to hold discussions.  *See supra* at 11-14.  Next, his conclusion that Vistant was the driving force of the joint venture is supported by the division of labor provisions of the agreement and relevant addendum.  Vistant's contributions to the joint venture's proposal are essential, even though the joint venture agreement did not establish the minimum amount of work it was to perform.  It provided [***] out of the ten corporate capability statements in the proposal, more than CollaborateUp's [***] and the major subcontractors' [***].  While it is the minority member, it owned 49% of the joint venture.  Moreover, under the terms of the joint venture, Vistant was primarily responsible for key technical areas, including [***] efforts and [***], and key support services identified in the request for proposals.  *See* AR 1200-01.  Put differently, the contracting officer had a reasonable basis for concluding that Vistant brought to the proposal experience distinct from CollaborateUp and that this distinct experience was also crucial to the TEC's technical evaluation.  Nevertheless, because the logic of his reasoning is based on Vistant's suspension his decision not to award the contract to the joint venture is erroneous.

Plaintiff's post-decision communications with the contracting officer do not alter this fact.  Its request to obtain the contract on the condition that it not respond to task orders until Vistant's suspension was lifted does not confirm a reading that Vistant was automatically terminated upon suspension.  Indeed, the joint venture proposed that it would resume pursuing task orders if Vistant's suspension was resolved.  *See* AR 1956.  This suggests the joint venture still considered Vistant a member.  Moreover, plaintiff indicated that its suggestion to substitute [***] for Vistant was an effort to "explore a path forward."  AR 1955.  In that email plaintiff even indicated certain steps (e.g., suspending or excluding Vistant as a defaulting party and carrying on without it under section 31 of the joint venture agreement) would have to be taken to

remove Vistant from the JV.  AR 1955.  This proposal does not amount to an acknowledgment that Vistant's suspension automatically terminated the venture.

In sum, the contracting officer's decision not to award plaintiff the contract after Vistant was suspended rested on his findings that Vistant was nonresponsible and that, as a result, he could not affirmatively determine the joint venture was responsible.  Insofar as his decision was based on a reading that the joint venture's term and termination provisions made suspension an event that automatically terminated the agreement, it is not rationally based on the record.  And, although his conclusion that Vistant brought essential contributions to the joint venture's proposal is adequately supported by the agreement's division of labor provisions, his decision not to award plaintiff the contract was nevertheless arbitrary and capricious because the suspension against Vistant was lifted before any task orders under the contract were awarded to small businesses.

### B.  Applicability of the SBA referral requirement

The parties also dispute whether the contracting officer was required to refer his nonviability determination to the SBA under the certificate of competency program.  The SBA is charged with administering the business development program established under Section 8(a) of the Small Business Act.  R. Corinne Blackford, Cong. Rsch. Serv., IF12458, *The SBA's 8(a) Business Development Program* at 1 (2003).  Section 8(a) aims to help eligible small businesses "overcome barriers to participating in federal contracting."  *Id.* at 1.

The certificate of competency program is one mechanism for helping small businesses obtain contracts.[10]  Under the program, if a contracting officer determines an apparently successful small business offeror is nonresponsible, he or she is required to "refer that small business to the SBA for a possible [certificate of competency]."  FAR § 19.601(c).  The contracting officer is excepted from this requirement, however, if the small business "[i]s suspended or debarred under . . . [FAR] subpart 9.4."  FAR § 19.602-1(a)(2)(ii).  Subpart 9.4 of the FAR "govern[s] debarment and suspension of contractors by agencies for the causes given in 9.406-2 and 9.407-2."  FAR 9.400(a)(1).  Both parties agree that the agency is not required to refer findings of technical unacceptability to the SBA.  Pl.'s Resp. at 3; Def.'s Reply at 2.

Plaintiff argues USAID acted contrary to law by finding the joint venture non-responsible without referring the matter to the SBA for a certificate of competency.  Pl.'s Mot. at 16-18.  Based on Vistant's exclusion and his finding that the JV was intertwined with Vistant, the contracting officer found he "cannot make an affirmative determination of responsibility for the

---

[10] The parties used another program that assists small businesses: the mentor-protégé program.  AR 1197.  The SBA's mentor-protégé program is "designed to assist small business development, focusing on enhancing the protégé's capacity to serve as either a prime contractor or a subcontractor in federal contracts" by "pair[ing] new businesses with more experienced businesses in mutually beneficial relationships."  Robert Jay Dilger & R. Corinne Blackford, Cong. Rsch. Serv., R41722, *Small Business Mentor-Protégé Programs* at 1 (2022).  Under the mentor-protégé program, a joint venture comprised of a mentor business and a protégé business may "submit an offer as a small business for a Federal procurement."  13 C.F.R. § 125.8(a).

JV." *Id.* at 16 (quoting AR 1952).  Plaintiff argues "the FAR mandates that the contracting officer refer a non-responsibility determination to SBA" to make a certificate of competency determination.  *Id.* at 17.  While this obligation does not arise when the small business concern "[i]s suspended or debarred under . . . subpart 9.4," plaintiff argues this exception does not apply to the joint venture because, while Vistant was suspended, the joint venture was not.  *Id.* at 17 n.3.

The joint venture also maintains that because the contracting officer did not actually conduct a technical evaluation, the joint venture's exclusion can rest only on a nonresponsibility determination.  Pl.'s Resp. at 3.  Accordingly, the government cannot avoid its obligation to refer the matter to the SBA by characterizing the contracting officer's decision as a finding of technical unacceptability.  *Id.*  Because the joint venture was neither debarred nor found to be affiliated with a debarred entity, the exception to the government's obligation to refer nonresponsibility determinations based on debarment or suspension to the SBA does not apply. *Id.* at 12-14.

The government argues that the exception to the referral requirement applies because Vistant—the joint venture's representative—and Mr. Barnes—the joint venture's agent and representative—were suspended and "the rules for suspension and debarment do not allow a suspended contractor to conduct business as an agent or representative of another contractor." Def.'s Cross-Mot. at 23-24; Def.'s Reply at 8-9.  Moreover, allowing a joint venture to be deemed responsible notwithstanding a suspension against one of its members would create an opportunity to circumvent suspension.  Def.'s Reply at 9.  Specifically, a suspended entity could avoid the effects of suspension by joining a non-suspended joint venture and submit bids under the joint venture's name.  *Id.*  Accordingly, the contracting officer's actions were consistent with the mandate that "[n]o agency shall allow" a suspended, debarred, or otherwise excluded "party *to participate* in any procurement . . . activity."  Def.'s Cross-Mot. at 25 (quoting 31 U.S.C. § 6101, Note).

As discussed, the contracting officer determined he was unable to "make an affirmative determination of responsibility for the JV."  AR 1952.  This amounts to a finding of nonresponsibility.  *See* FAR § 9.103(b).  The contracting officer's decision not to award the joint venture the contract did not rest on an independent finding of technical unacceptability.  *See supra* at 8-11.

Accordingly, the contracting officer was required to refer the matter to the SBA for a certificate of competency determination unless the exception for small business concerns suspended under FAR subpart 9.4 applies.  FAR § 19.602-1(a)(2).  Because Vistant was suspended under FAR subpart 9.4, the only issue is whether Vistant's suspension nullifies the government's obligation to refer the joint venture's nonresponsibility determination to the SBA. FAR § 9.407-3 (suspension); AR 1924-25.   Read together with FAR § 9.405(a), FAR §19.602-1(a)(2) removes the government's obligation to refer the matter to the SBA.  The joint venture and Vistant are two separate small business concerns.  *See* FAR § 19.001.  Nevertheless, FAR § 9.405(a) states that suspended contractors "are also excluded from conducting business with the [g]overnment as agents or representatives of other contractors."  So, as long as the joint venture was comprised of CollaborateUp and Vistant, any active suspension against either

18

member or the joint venture would obviate the requirement to refer nonresponsibility determinations to the SBA.

### C. Prejudice

Plaintiff contends that the contracting officer's decision prejudiced the joint venture because "[h]ad SBA received a referral from USAID, [plaintiff] would have explained that it was in a position to perform the work, had committed to do so through the joint venture agreement, and that it had subcontractors able to perform." Pl.'s Mot. at 17-18. But for defendant's failure to refer the matter to the SBA, plaintiff considered that it would have received the award. Pl.'s Resp. at 15.

Defendant contends that plaintiff has not established prejudice. According to defendant, the contracting officer concluded the proposal was unacceptable for reasons unrelated to responsibility, specifically, "because of the material changes that the suspension brought to the proposal." Def.'s Cross-Mot. at 26. Even had the SBA awarded the joint venture a certificate of competency, this independent ground for elimination from the competition prevents plaintiff from establishing it had a substantial chance of being awarded the contract. *Id.* Moreover, plaintiff's argument that both its members would now be deemed eligible is inapposite because Vistant's suspension was not lifted until after USAID made its award. *Id.* at 27. Alternatively, even if both Vistant and CollaborateUp were considered eligible for award, Mr. Barnes is still included in the proposal. *See* Mot. Hr'g Tr. 28:1-14. The contracting officer might deem his inclusion independently sufficient to render the joint venture ineligible for an award. *See id.*

Plaintiff was prejudiced by the contracting officer's decision to eliminate it from the competition. The SBA certificate of competency referral process and the procedures for challenging Vistant's suspension both are potential mechanisms for determining whether the joint venture is responsible. The former path is not available to plaintiff here, but the latter is. And Vistant's suspension has been removed. The contracting officer had deemed plaintiff an apparently successful offeror when he learned of Vistant's suspension and primarily relied on its suspension when he decided not to go forward with the award. Plaintiff was not entitled to have the matter referred to the SBA for a certificate of competency determination, so it was not prejudiced by the agency's failure to refer the matter. Instead, plaintiff was prejudiced by the contracting officer's decision because it was predicated on a nonresponsibility determination that was subsequently removed.

The contracting officer did note Mr. Barnes's suspension, but the record is not clear on whether his suspension alone provides a sufficient basis to find the joint venture nonresponsible. The suspension on which he primarily predicated this decision has been removed. Because the joint venture's eligibility for an award depends upon the contracting officer's consideration of the facts that Vistant's suspension has been removed and that Mr. Barnes remains suspended, the court remands the matter to the contracting officer to reevaluate plaintiff's responsibility based on these developments.

### D.  Injunctive relief

Plaintiff argues it is entitled to a permanent injunction "prohibiting USAID from rescinding its award of an IDIQ contract."  Compl. at 10.  Plaintiff asserts it will suffer irreparable harm absent an injunction because the contracting officer's decision has caused it to lose profits and denied it both the opportunity to compete fairly for the contract and the experience that would come with working on the procurement.  Pl.'s Mot. at 18-19.  Next, the joint venture argues the balance of hardship and the public interest favor an injunction.  *Id.* at 19-20.  Whereas plaintiff "faces significant hardship in the form of not being able to compete for task orders . . . [t]he hardship to the government is relatively non-existent" and is tied to Vistant's exclusion, which has since been lifted.  *Id.*

Defendant argues plaintiff is not entitled to injunctive relief.  Specifically, defendant contends plaintiff's claims that absent an injunction it will lose profits, experience, and the opportunity to work are too speculative to establish irreparable harm because "the [g]overnment retains the right to terminate the contract for convenience."  Def.'s Cross-Mot. at 30.  Turning to the balance of hardships and the public interest, defendant contends "it is in the public interest not to disturb" the contracting officer's rational exercise of discretion concerning "the effect of a valid suspension."  *Id.* at 30-31.

Because plaintiff has succeeded on the merits of its first count, that the government erred by eliminating plaintiff's proposal from the competition, the first factor of injunctive relief weighs in plaintiff's favor.  Next, a protestor "deprived of the opportunity to compete fairly for a contract" suffers irreparable harm.  *Palantir USG, Inc. v. United States*, 129 Fed. Cl. 218, 291 (2016) (quoting *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 494 (2013)), *aff'd*, 904 F.3d 980 (Fed. Cir. 2018).  For the reasons stated, it would be unfair to allow the contracting officer's decision to stand because it rests primarily on a suspension that has since been lifted.  So, unless the contracting officer reassesses plaintiff's responsibility, the joint venture will suffer irreparable harm.  The second factor also weighs in plaintiff's favor.

In applying the third factor, the court balances the potential harm not granting the injunction would cause petitioner against the potential harm granting the injunction would cause the government and awardees.  *Guzar Mirbachakot Transp. v. United States*, 104 Fed. Cl. 53, 67 (2012).  The contract at issue is an IDIQ contract, and adding one more contractor to the pool of awardees competing for task orders would cause little harm to the current awardees.  Additionally, the government already deemed plaintiff an apparently successful offeror before discovering Vistant's suspension and on remand it will assess whether Mr. Barnes's suspension renders plaintiff nonresponsible.  Regardless of whether the government finds plaintiff nonresponsible and again eliminates it from the competition or finds plaintiff responsible and awards it a contract, the government will not be harmed.  That leaves the time and expense of reevaluation on remand.  The little harm caused to awardees and the government is outweighed by the harm plaintiff would suffer if the contracting officer's erroneous decision to eliminate plaintiff from the competition is left in place.  The third factor accordingly weighs in plaintiff's favor.

Finally, an injunction would serve the overriding public interest in preserving the integrity of the federal procurement process by requiring the government to address a contracting

officer's decision that rests on a suspension that was lifted before any task orders under the contract were awarded to small businesses. *See AAA*, 106 Fed. Cl. at 734. The fourth factor also militates in plaintiff's favor.

Because all four factors weigh in plaintiff's favor, the court issues a limited injunction mandating that, on remand, USAID reevaluate plaintiff's responsibility and award it the contract if it determines plaintiff to be responsible.

## CONCLUSION

One fact that has not been overcome by subsequent developments is that Mr. Barnes still has an exclusion against him. SAM.gov, *Walter Barnes*, https://sam.gov/exclusions-new?pirKey=523871&pirValue=1699444106841864 (last visited June 12, 2024) (indicating proceedings are pending). Plaintiff contends that "[t]he contemporaneous record contains no indication that [the contracting officer] based his decision on Mr. Barnes'[s] suspension." Pl.'s Resp. at 10 n.5. Indeed, in explaining his decision, the contracting officer does not mention Mr. Barnes by name. *Id.* Defendant responds that the contracting officer noted Mr. Barnes's suspension and that he signed the joint venture agreement on Vistant's behalf. Def.'s Reply at 8 n.5. Accordingly, the contracting officer "had before him the facts that Vistant and its president were suspended from transactions with the government," *id.*, and he did not err in refusing to award plaintiff the contract because "the rules for suspension and debarment do not allow a suspended contractor to conduct business as an agent or representative of another contractor," *see* Def.'s Cross-Mot. at 24.

The court finds the record is unclear as to whether the contracting officer considered the exclusion against Mr. Barnes to be a ground that was independently sufficient to support his decision not to award the joint venture the contract.

For the reasons stated, plaintiff's motion for judgment on the administrative record is **GRANTED in part and DENIED in part**, and the government's cross-motion for judgment on the administrative record is **GRANTED in part and DENIED in part**. The contracting officer's November 13, 2023, decision not to award plaintiff the contract is null and void and is vacated. The court **REMANDS** this matter to USAID to reevaluate PMCG CollaborateUP JV LLC's eligibility for award in accordance with this opinion. On remand, USAID is enjoined from considering the suspension against Vistant. RCFC 52.2(b)(1)(A). This reevaluation shall be completed within 45 days from the date this opinion is filed publicly, RCFC 52.2(b)(1)(B), and the decision on remand shall be filed with the Clerk as provided in RCFC 52.2(e). During the remand period, proceedings in this case shall be **STAYED**. RCFC 52.2(b)(1)(C). The parties shall file a joint status report regarding further proceedings before the court no later than five days following the decision on remand. The Clerk is **DIRECTED** to serve a copy of the public version of this order, once it is filed, on USAID at the following address:

Mr. William Buckhold
Assistant General Counsel
USAID, GC/LE
Ronald Reagan Building (RRB) Rm 6.06-1-071

1300 Pennsylvania Ave., NW
Washington, DC 20523-6601

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Senior Judge